# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED

Mar 22 2017, 11:02 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Ruth A. Johnson
Deborah Ball Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# I N  T H E
# COURT OF APPEALS OF INDIANA

Kenneth Scott,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 22, 2017

Court of Appeals Case No.
49A04-1607-CR-1612

Appeal from the Marion Superior Court.
The Honorable Helen Marchal, Judge.
Cause No. 49G15-1603-F6-9963

**Barteau, Senior Judge**

# Statement of the Case

Kenneth Scott appeals from his conviction of one count of Level 6 felony theft,[1] contending that there is insufficient evidence of his intent to commit the offense. We affirm.

# Facts and Procedural History

On March 10, 2015, Indy Airport Taxi Company driver Izzat Shehadeh was dispatched on a Medicaid run. There are specific procedures in place for such transportation. Medicaid runs are arranged in advance with a pre-designated pickup and drop off location. Paperwork is sent to the taxi company ahead of time and the run is dispatched to a driver. The driver receives the person's name and telephone number and maintains paperwork which the passenger must sign as confirmation of the ride. The driver must take the shortest route possible and any changes in the destination must have Medicaid authorization before the driver can take the passenger there. An additional difference in these rides is that, unlike usual fares, the meter is never running and payment comes to the taxi company from Medicaid instead of the passenger.

On that day, Shehadeh picked up Scott from Community North Hospital. Once inside the cab, however, Scott did not want transportation to the designated location. Shehadeh explained that he could only take Scott to the

---

[1] Ind. Code § 35-43-4-2(a)(1)(C) (2014).

designated location and that if any changes were necessary, Scott would have to speak with the dispatcher.

[4] Scott spoke with Lacie Downing, the dispatcher for Indy Airport Taxi Company. She reiterated that the taxi could only take Scott to the location authorized by Medicaid. She confirmed that Scott would need to speak to the Medicaid dispatcher to make any changes. Downing also made clear that Medicaid would not pay the fare for a ride to an unauthorized location. When Scott told her that he was not going to speak with anyone with Medicaid, Downing gave Scott the options of being returned to the hospital where he was picked up or being taken to the authorized destination.

[5] Scott became angry. He started calling Downing names, and used foul language with both Downing and Shehadeh. For safety reasons, Downing instructed Shehadeh to take Scott wherever he wanted to go. She then told Scott that he was no longer allowed to use Indy Airport Taxi Company. Shehadeh took Scott to a Steak 'N Shake on Keystone Avenue near the location Scott had requested. During the trip, however, Scott remained angry and engaged in aggressive behavior with Shehadeh for the entire ride there. Shehadeh felt so threatened by Scott's behavior, he stopped the car at the destination, grabbed his keys and phone, and ran from the vehicle, staying away until Scott had left the area.

[6] Later, around twenty-five to forty minutes afterwards, Indy Airport Taxi Company was contacted by an employee at a Rally's restaurant located on

Keystone Avenue requesting a ride for a person identified as Tommy King. When the ride was requested, there was no mention that it would be a Medicaid ride and the taxi company had not received Medicaid paperwork authorizing a ride from that location. Driver Mohamed Fashir was dispatched to pick up the passenger, who was later identified as Scott.

[7] Because there was no mention of this being a Medicaid run and no paperwork had been supplied, Fashir ran the meter after he started driving Scott to his requested destinations. Scott never questioned why the meter was running on this particular trip. Scott first asked to go to the post office and requested that Fashir wait for him outside. After around fifteen to seventeen minutes, Scott returned to the taxi and asked first to be taken to another location before changing his mind and requesting to be taken downtown to a CVS.

[8] Once they arrived at the CVS, Fashir asked Scott to pay his fare. Scott refused and instead asked to sign the clipboard as if it had been a Medicaid run. Fashir informed Scott that he did not have to sign because it was not a Medicaid run. He also indicated that Medicaid would not pay for the ride, so Scott would have to pay the fare. Fashir called the taxi company dispatch to confirm that it was not a Medicaid run and that Scott would have to pay for the ride himself. Scott refused to pay and attempted to grab the clipboard to sign it. Fashir then called the police. Scott exited the taxi and sat at a nearby bus stop. Fashir remained there until police officers arrived.

[9] Officer Brandon Shirey, a patrolman with the Indianapolis Metropolitan Police Department, was dispatched to the scene. Meanwhile, no buses had stopped at the bus stop where Scott was sitting. Officer Shirey spoke to Fashir about the incident with Scott. While they were talking, Scott approached and told Officer Shirey it was a Medicaid ride. Scott volunteered that he was picked up at Community North Hospital and was brought to the CVS. Officer Shirey spoke to Downing, learned the procedure pertaining to Medicaid rides, and discovered that Scott had been picked up under an assumed name. The officer also learned that Fashir had picked up Scott at Rally's, not a medical facility, and brought him to the CVS.

[10] Officer Shirey asked Scott to explain the situation, but Scott did not. Scott was arrested and handcuffed. He then reached into his pockets, pulled out some money, which was not enough to cover the fare, and yelled and screamed that he would pay for the ride.

[11] The State charged Scott with theft as a Class A misdemeanor and alleged that the offense should be enhanced to a Level 6 felony because of a prior conviction. At the conclusion of a jury trial, Scott was found guilty of theft as a Class A misdemeanor. By stipulation, Scott was convicted of Level 6 felony theft due to the enhancement for his prior conviction. The trial court sentenced Scott to 365 days on home detention through community corrections. Scott now appeals.

## Discussion and Decision

[12] Scott claims that there is insufficient evidence to support his conviction because the State failed to meet its burden of proving he acted intentionally.

[13] In order to convict Scott of theft, the State had to prove beyond a reasonable doubt that Scott knowingly or intentionally exerted unauthorized control over the property of Indy Airport Taxi Company or Mohamed Fashir with the intent to deprive Indy Airport Taxi Company or Mohamed Fashir of its use or value. Ind. Code § 35-43-4-2(a).

[14] When we review a claim challenging the sufficiency of the evidence we neither reweigh the evidence nor assess the credibility of the witnesses. *Treadway v. State*, 924 N.E.2d 621, 639 (Ind. 2010). Instead, we consider only the evidence and reasonable inferences drawn therefrom that support the verdict. *Id.* We will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

[15] "Intent, being a mental state, can only be established by considering the behavior of the relevant actor, the surrounding circumstances, and the reasonable inferences to be drawn from them." *Davis v. State*, 791 N.E.2d 266, 270 (Ind. Ct. App. 2003), *trans. denied*. Further, "a person engages in conduct 'intentionally' if, when he engages in the conduct, it is his conscious objective to do so." Ind. Code § 35-41-2-2(a) (1977).

[16] The record reflects that Scott knew the procedures and restrictions involved with taxi rides paid for by Medicaid. The procedures and limitations were

explained to him in detail by both Downing and Shehadeh during the first incident when Scott improperly changed the location of his destination. Scott knew that the taxi driver was only allowed to take him to a Medicaid-authorized location. After this ride, Scott enlisted the help of a Rally's employee to call the same taxi company, from which he had been banned after the first ride, to arrange a ride for him under a false name. Scott asked to be taken to multiple locations, none of which were his home or a medical facility. He did not mention anything about the fare being a Medicaid ride until Fashir asked him to pay for his fare. Scott refused to pay and attempted to sign the Medicaid clipboard despite confirmation from the taxi company dispatch that this was not an authorized Medicaid run.

[17] Scott did not have enough money to cover the fare. He was inside the taxi when Fashir called the police. Instead of paying all or part of the fare, he then left the vehicle and waited at a nearby bus stop. The taxi ride was not pre-approved or authorized by Medicaid, and Medicaid would not have paid Indy Airport Taxi Company for the fare of a fictitious person.

[18] Our standard of review requires us to consider only the evidence and reasonable inferences drawn therefrom that support the verdict. *Treadway*, 924 N.E.2d at 639. Therefore, the issue is whether the inferences supporting the verdict were reasonable, not whether other, potentially more reasonable, inferences could have been drawn from the evidence. *Jones v. State*, 22 N.E.3d 877, 879 (Ind. Ct. App. 2014).

Considering Scott's behavior, the surrounding circumstances, and the reasonable inferences to be drawn from them, we conclude that there is sufficient evidence that Scott acted intentionally.

# Conclusion

In light of the foregoing, we affirm the trial court's judgment.

Affirmed.

Najam, J., and Bailey, J., concur.